UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

WARREN TAYLOR,

                                                Plaintiff,

                -against-

THE CITY OF NEW YORK; DEPARTMENT OF CORRECTION COMMISSIONER JOSEPH PONTE; BUREAU CHIEF OF SECURITY BRIAN SUPRENANT; CAPTAIN HARPER; DEPUTY WARDEN CORT; CORRECTION OFFICER ANDERSON #3597; CORRECTION OFFICER STEVENSON; GRVC WARDEN YOLANDA CANTY, ASSISTANT DEPUTY WARDEN SARDIA LEWIS #97; CORRECTION OFFICER JOHN DOE SUPERVISING AND POLICY MAKING OFFICIALS, ##1-8; JOHN DOE CORRECTION OFFICIAL RESPONSIBLE FOR DETAINEE PLACEMENT IN HOUSING AREAS ##1-4; JOHN DOE CORRECTION OFFICERS ##1-8,

                                               Defendants.

**COMPLAINT AND JURY DEMAND**

ECF CASE

------------------------------------------------------------------------ x

## PRELIMINARY STATEMENT

1.     This is a civil rights action in which Plaintiff seeks relief for the violation of their rights secured by 42 USC §§1983 and 1988, and the Eighth and Fourteenth Amendments to the Constitution of the United States of America.

2.     The claim arises from an assault on Plaintiff that caused him to sustain a serious and permanent injury to his eye. The assault was the culmination of the deliberate indifference by the defendant correction officials and the City of New York resulting in serious injury to the Plaintiff and the deprivation of his right to be free of cruel and unusual punishment guaranteed by the Eighth Amendment to the Constitution of the United States.

3.     Plaintiff seeks monetary damages (special, compensatory, and punitive) against

defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

## JURISDICTION

4. This action is brought pursuant to 28 USC §1331 and 42 USC §1983. Pendent party jurisdiction is asserted.

5. The amount in controversy exceeds $75,000.00 excluding interest and costs.

6. Venue is laid within the United States District Court for the Southern District of New York in that Defendant City of New York is located within and a substantial part of the events giving rise to the claim occurred within the boundaries of the Southern District of New York.

## PARTIES

7. Plaintiff is an African-American citizen of the United States and at all times here relevant was in the custody of the New York City Department of Correction ("DOC") in the George R. Vierno Center ("GRVC") on Rikers Island, Bronx County, NY.

8. The City of New York ("the City") is a municipal corporation organized under the laws of the State of New York.

9. DOC Commissioner Joseph Ponte ("Ponte") was at all times here relevant the Commissioner of DOC. As such Ponte was personally involved in creating and continuing DOC and City policies referenced herein, and was personally involved in training, supervision, and discipline of DOC officers, including the individual defendants herein.

10. Brian Suprenant ("Suprenant") was at all times here relevant the Bureau Chief of Security for the New York City Department of Correction. As such, Suprenant was responsible for the policy, practice, supervision, implementation, and conduct of all DOC. security matters.

Ponte and Suprenant were regularly provided with reports of applications of force, allegations of unreported uses of force, and other breaches of security in DOC jails.

11. Warden Yolanda Canty ("Canty") was at all times relevant the Warden of GRVC. As such, Canty was responsible for the policy, practice, supervision, implementation and conduct of security within GRVC.

12. All other individual defendants ("the officers") were at all times relevant correction officers, captains, assistant deputy wardens, and deputy wardens employed by the DOC.

13. At all times here mentioned defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York. All defendants are sued in their individual and official capacities as officials of the City of New York's Department of Corrections.

**HISTORY OF GANG VIOLENCE AT GRVC BETWEEN CRIPS AND TRINITARIOS**

14. GRVC, 15A has housed detainees known as SRG's, or members of "security risk groups", for all times here relevant. In addition, 15A houses detainees deemed by the Department of Corrections to be dangerous and high security risks.

15. At least since August 5, 2013, 15A housed detainees identified by DOC officials as members of the Crips gang and members of the Trinitarios gang (also known as the Patrias).

16. It is well known to correction officials, including the Defendants herein, that detainees assigned to this housing units are assumed by detainees to be Crip or Trinitario gang members, regardless whether they are actually gang members. Black non-Latino detainees housed there are assumed to be members of the Crips, while Latino detainees are assumed to be members of the Trinitarios.

17. It is well known that these two gangs are rival gangs. *See e.g.*

http://www.nydailynews.com/news/crime/violent-fight-rikers-island-hour-article-1.1434413.

18. On or about August 5, 2013, a gang riot between Crips and Trinitarios broke out in GRVC at, upon information and belief, house 15A. It continued for 45 minutes before it was stopped by correction officers.

19. At least 11 inmates were injured in connection with the August 5, 2013 riot, including many with serious lacerations caused by blades, shanks or similar sharp objects.

20. On or about December 25, 2013, a gang riot took place between Crips and Trinitarios at GRVC 15A, resulting in multiple injuries to detainees.

21. On or about May 12, 2014, a gang riot took place between Crips and Trinitarios at GRVC 15A, resulting in injuries to many detainees. Blades, shanks or similar sharp objects were used by detainees in the course of that incident.

22. On or about May 20, 2014, a fight between two rival gang members broke out at GRVC, resulting in the death of a detainee.

23. On or about June 5, 2014, a gang riot took place between Crips and Trinitarios at GRVC 15, resulting in multiple injuries to detainees.

24. On June 11, 2014, DOC Captain Claudel Jean-Pierre submitted a report of his investigation of the May 12, 2014 incident. In that report, Captain Jean-Pierre noted that the gang riot was a result of the "ongoing power struggle" to control the housing unit between the Crips and Trinitarios and referenced prior incidents. In addition, his report noted that "there have been clear statements made by inmates affiliated with both the Crips and Trinitarios that this conflict will go on and acts of retaliation are imminent."

25. Despite such warning, no corrective measures were taken by defendants to

address the ongoing problem of violence.  Indeed, it appears that the first official action taken in response to Captain Jean-Pierre's report was to level disciplinary charges against Captain Jean-Pierre for his report. The charges were initiated by Defendant ADW Sardia Lewis.

26. Upon information and belief, between August 5, 2013 and January 10, 2015, there were other incidents of violence involving rival gangs in GRVC.

## PLAINTIFF'S IMPRISONMENT

27. Plaintiff was remanded to Rikers Island while his criminal case was pending in Kings County Supreme Court.  He was placed in protective custody for his own safety due to the sexual nature of the charges he was incarcerated under.

28 In 2013, over Plaintiff's stated objections, Plaintiff was moved from protective custody to the general population.

29. On March 12, 2014, Plaintiff was assaulted and seriously injured by another inmate because of the charges against him.

30. Plaintiff filed a Notice of Claim against the City in connection with the incident.

31. On or about April 28, 2014, Judge Chung of Brooklyn Supreme Court ordered that plaintiff be held in protective custody due to safety concerns.

32. On the "court card" he was required to hold on his way back from court, it said that he was required to be held in protective custody, the words were written in red for emphasis.

33. Despite the judge's order and his court card, and over plaintiff numerous formal and informal complaints, plaintiff was placed back in general population in GRVC 15A.

34. Just prior to being housed in GRVC 15A, he was housed in a medium security housing area, where generally detainees determined to be less of a danger or security risk are housed.  Plaintiff himself had such a low level security designation.

35. Upon information and belief, plaintiff's housing unit was closed and he was moved to GRVC 15A. Upon information and belief, plaintiff was assigned to 15A by defendants Cort and Harper, in addition to John Doe Correction Officials Responsible for Detainee Housing Placement.

36. His assignment to the general population in GRVC 15A clearly violated the court's order to keep plaintiff in protective custody, a court order that was well known to Defendants Cort, Harper and other correction officials. Despite the court order, and Plaintiff's repeated protestations that he must be held in protective custody, he was kept in general population in GRVC 15A.

37. Plaintiff was maliciously and intentionally put in greater danger because correction officers, including defendant Correction Officer Stevenson, published to other detainees in 15A that he was being held for sexual crimes. Just weeks before the incident, another detainee with similar charges to Plaintiff had to be moved out of the housing area because his safety was threatened. Upon information and belief, Stevenson told detainees in his housing area that Plaintiff had the same charges as the recently moved detainee for the purpose of exposing Plaintiff to serious harm. The hostility from detainees and guards due to the publishing of his charges was felt by plaintiff.

38. On January 10, 2015, a large fight involving multiple detainees broke out in 15A. Plaintiff was not part of the fight and was in fact more than 100 feet away from where the fight was happening.

39. Plaintiff remained at this relatively safe distance until probe team correction officers demanded that he go to the location of the fight and get on the floor. Plaintiff complied, reluctantly, with the officers' command.

40. With multiple defendant John Doe officers standing by, Plaintiff was attacked by Jose Grijalva, another detainee housed in 15A. Mr. Grijalva stabbed Plaintiff in the eye and while doing so cited to the criminal charges that Defendant Officer Stevenson and other officers published to Jose Grijalva and his fellow inmates as the reason for the attack. In addition, according to state records, Mr. Grijalva is Latino and upon information and belief a member of the Trinitarios. Plaintiff is not a member of any gang but as an African-American male other detainees in 15A presumed him to be a member the Crips.

41. Defendant Correction Officer Anderson, according to the Notice of Infraction, told the Plaintiff and Jose Grijalva to "stop fighting", but the order was not complied with. Defendant Anderson had other methods available to him to stop the assault in a more prompt manner but with deliberate indifference chose not to take such actions, causing Plaintiff's injuries.

42. Plaintiff lost his eye in the attack and now has an ocular prosthesis in its place. He is completely blind in that eye.

43. At all times during the events described above, the officers were engaged in a joint venture and formed an agreement with each other and with other inmates to violate Plaintiff's constitutional rights. By placing Plaintiff in the general population when they knew he would be targeted by other detainees; and further by allowing fights and riots repeatedly to go on for such long periods of time in Plaintiff's housing unit, the defendants showed deliberate indifference to the safety of Plaintiff, causing him injury. The individual officers assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other during said events. They failed to intervene in the obviously illegal actions of their fellow officers and other inmates against Plaintiff. They acted

maliciously and with intent to injure Plaintiff, and at best with deliberate indifference to a known threat of physical injury from other inmates.  As a direct and proximate result of the acts of defendants, Plaintiff suffered the following injuries and damages:

    a. Violation of his right to Due Process of Law under the Fourteenth Amendment to the United Stated Constitution;

    b. Violation of his right under the Eighth Amendment to the United States Constitution to be free from cruel and unusual punishments;

    c. Physical pain and suffering;

    d. Serious ongoing and continuing injury;

    e. Emotional trauma and suffering, including fear, embarrassment, humiliation, emotional distress, horror, frustration, and anxiety.

<u>**FIRST CAUSE OF ACTION**</u>
**(42 U.S.C. § 1983 – EIGHTH AND FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES)**

44.    The above paragraphs are here incorporated by reference.

45.    Defendant Officer Stevenson and John Doe Officers ##1-8 acted under color of law and with intent and/or deliberate indifference to deprive Plaintiff of his civil, constitutional and statutory rights to be free from cruel and unusual punishment pursuant to the Eighth and Fourteenth Amendments to the United States Constitution, when they published plaintiff's criminal charges to detainees that they knew were likely to cause plaintiff serious harm because of his charges.

46.    The Defendant officers Anderson and John Doe Officers ##1-4, acted under color of law and with intent and/or deliberate indifference to deprive Plaintiff of his civil, constitutional and statutory rights to be free from cruel and unusual punishment pursuant to the

Eighth and Fourteenth Amendments to the United States Constitution, when Defendant Anderson and John Doe Defendants ##1-4 observed the attack on Plaintiff by other detainees but did not take action to prevent the assault in a timely manner and/or permitted the assault to occur and continue.

47. The Defendants Cort and .Harper acted under color of law and with intent and/or deliberate indifference to deprive Plaintiff of his civil, constitutional and statutory rights to be free from cruel and unusual punishment pursuant to the Eighth and Fourteenth Amendments to the United States Constitution, when they ignored the Order of the Kings County Supreme Court to place him in protective custody and; ignored the knowledge that he would be a target for assault (or worse) based on the charges he was facing and that he had already been assaulted for this reason once before and; ignored his protestations that he must be placed in protective custody and nevertheless placed him into the general population of an extremely dangerous housing unit with a lengthy track record of recent serious violence.

48. Defendant officers Stevenson, Cort, Harper, Anderson and John Doe defendants are liable to Plaintiff under 42 U.S.C. §1983.

49. Plaintiff has been damaged as a result of defendants' wrongful acts.

<b><u>SECOND CAUSE OF ACTION</u></b><br><b>(42 U.S.C. § 1983- MUNICIPAL AND SUPERVISORY LIABILITY)</b>

50. The above paragraphs are here incorporated by reference.

51. Issues of gang rivalry leading to violence have long plagued DOC facilities. In addition, the issue of assaults on inmates who have been charged with crimes of a sexual nature, and that detainees ordered to be in protective custody are often placed into the general population by deliberately indifferent correction officials have also been long standing DOC problems. These facts were well known to the Defendants City, Commissioner Ponte, Chief of Security

Suprenant, and John Doe Supervisors and Policy Makers through information provided by DOC's Gang Investigation Unit, grievances and complaints submitted by detainees and their families, the Inspector General's Office, news reports, notices of claim and lawsuits.

52. Furthermore, defendants City, Commissioner Ponte, Chief of Security Suprenant, Warden Canty, and John Doe Supervisors and Policy Makers knew of the problem of gang violence specifically within GRVC 15A for many months prior to this incident, as described above. Indeed, these defendants knew to a moral certainty that unless the problem was sufficiently addressed, more detainees such as Plaintiff would be injured or killed in gang violence. Nevertheless, these defendants took no or insufficient actions to address these constitutional violations and prevent further such violations.

53. In January 2015, the population of detainees on Rikers Island and generally in DOC custody was at least at a 25 year low. The average number of inmates in DOC custody in 2014 was 11,408, and was 13% lower since 2010.[1] Moreover, the DOC has a capacity to hold at least 18,000 detainees.[2] Nevertheless, despite having available space to better separate suspected rival gang members, Defendants City, Commissioner Ponte, Chief of Security Suprenant, Warden Canty and John Doe Supervisors and Policy Makers house them together in the same house, essentially inviting gang violence.

54. Moreover, despite being well below capacity, Defendants City, Commissioner Ponte, Chief of Security Suprenant, Warden Canty and John Doe Supervisors and Policy Makers place detainees who should be or are mandated by courts to be in protective custody in the general population of high security risk housing units, again essentially inviting violence against those detainees with charges relating to sexual crimes.

---

[1] Mayor's Management Report, 2014. http://www.nyc.gov/html/ops/downloads/pdf/mmr2014/doc.pdf,
[2] DOC Web site. http://www.nyc.gov/html/doc/html/about/facilities-overview.shtml

55. In addition, Defendants City, Commissioner Ponte, Chief of Security Suprenant, and Warden Canty John Doe Supervisors and Policy Makers knew from the prior incidents listed here among others, that detainees in GRVC were obtained sharp objects to assault other detainees. After an extensive investigation, the NYC Department of Investigation found that previous findings whereby correction officers were permitted to transport contraband into Rikers facilities were not remedied, and that in 2014, correction officers were still transporting contraband such as razor blades into the facilities without being checked and with impunity.[3] Clearly, these defendants failed to take corrective actions to stop such weapons from getting into the hands of detainees, and that such failure caused plaintiff among many other inmates to be slashed and stabbed.

56. Furthermore, Defendant Warden Canty knew personally of the extremely dangerous security situation in GRVC, Housing Unit 15A because Captain Claudel Jean-Pierre wrote an extensive report to her on June 11, 2014 illustrating the ongoing problem and that the problem was likely to continue. Regardless, Warden Canty took no or wholly inadequate measures to prevent further violence against detainees, causing injury to Plaintiff.

57. Also, in response to Captain Jean-Pierre's extensive and investigative reports highlighting the long standing issue of gang violence in 15A and the likelihood it would continue, Defendant Assistant Deputy Warden Sardia Lewis charged Captain Jean-Pierre with disciplinary infractions in connection with the report he submitted to Warden Canty. In doing so, ADW Lewis helped create an environment of intimidation and retaliation against Correction employees who honestly report security problems in the facility. Such retaliation creates a culture of cover-up and actual cover-ups in the system, leading to official impunity and constitutional violations against detainees.

---

[3] http://www.nyc.gov/html/doi/downloads/pdf/2014/Nov14/pr26rikers_110614.pdf.

58.     Moreover, Defendants City, Commissioner Ponte, Chief of Security Suprenant, and John Doe Supervisors and Policy Makers failed to discipline, train, or supervise their correction officers regarding gangs and gang riots.  In each case described above prior to the incidents in which Plaintiff was injured, correction officers failed miserably to stop the violence, allowing it to go on for long stretches of time and failing to assist detainees who were trying to avoid the violence, causing them injury.  The Correction Officer Benevolent Association chief Norman Seabrook blames the lack of effective response on there being too few correction officers.  In either case, these defendants are in a position to remediate these problems but have failed to do so, causing injury to Plaintiff.

59.     In addition to the above mentioned policy failures, Defendants City, Commissioner Ponte, Chief of Security Suprenant, Warden Canty and John Doe Supervisors and Policy Makers virtually never discipline officers for not reporting fellow officers' misconduct that they have observed, and they often fail to discipline officers for making false statements to disciplinary agencies.

60.     The investigatory body responsible for monitoring officer behavior, the Inspector General's office, also wrongfully allows officers to write their own reports, rather than interviewing officers individually, whereas complaining inmates are interviewed in person for the same incidents.  Such a practice allows officers to fabricate versions of events consistently with each other, a practice commonly known to officers as "writing with me".  Standard practice for receiving inmate statements concerning the same incidents, however, consists of personal interviews with the inmates.  This disparity in investigatory techniques results in officer statements being far more consistent and uniform than inmate statements, and thus far more readily credited.

61. When correction officers are sued for injuries sustained by inmates as a result of violence, if there was no finding of wrongdoing by the officer by the City, the City has a policy of representing correction officers through Corporation Counsel instead of paying outside counsel. This means Corporation Counsel's duty to the individual officers prevents it from reporting problem officers to the Department of Correction. In addition, there is no formal reporting mechanism between the Comptroller's office and the Department of Correction regarding the financial losses to the City resulting from lawsuits related to officers' conduct. This is part of the "total disconnect" between the results of civil suits and individual officers' careers that have been very publicly observed, prior to the incidents in question, by former City Comptroller Alan Hevesi. The Association of the Bar of the City of New York, Committee on New York City Affairs, published a written report in 1990 recommending that the City create formal reporting mechanisms in cases of police abuse, and the recommendations and reasoning apply equally to suits against correction officers. No such reporting mechanisms had been created by the time of the incidents in question.

62. Defendants City, Commissioner Ponte, Chief of Security Suprenant, Warden Canty and John Doe Supervisors and Policy Makers knew that gang riots and violence, and the propensity of inmates to assault inmates charged with crimes of a sexual nature presented a threat of imminent harm to Plaintiff, but failed to take any corrective action. These Defendants further knew of the repeated failures of correction officials to place detainees mandated for protective custody in the general population, but failed to take any corrective action.

63. The above described policies and customs and failures to train, supervise, or discipline demonstrated a deliberate indifference on the part of policymakers of the City, Commissioner Ponte, Chief of Security Suprenant, Warden Canty, ADW Lewis and John Doe

Supervisors and Policy Makers to the constitutional rights of persons within New York City, and were the cause of the violations of Plaintiff's damages and are liable to plaintiff under §1983.

WHEREFORE, Plaintiff demands judgment against the defendants, jointly and severally, as follows:

A. In favor of Plaintiff in an amount to be determined by a jury for each of Plaintiff's causes of action;

B. Awarding Plaintiff punitive damages in an amount to be determined by a jury;

C. Awarding Plaintiff reasonable attorneys' fees, costs and disbursements of this action; and

D. Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:     Brooklyn, New York
           September 26, 2016

TO:    New York City Corporation Counsel        Yours, etc.,
       100 Church Street, 4th floor
       New York, NY  10007
                                                Stoll, Glickman & Bellina, LLP
       Commissioner Joseph Ponte                By: Leo Glickman (LG3644)
                                                Attorney for Plaintiff
       Bureau Chief of Security Brian Suprenant  475 Atlantic Ave., 3rd Flr.
                                                Brooklyn, NY  11217
       GRVC Warden Canty                        (718) 852-3710
                                                lglickman@stollglickman.com
       ADW Sardia Lewis #97

       Correction Officers Anderson #3597,
       Stevenson, Cort and Harper