UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x
WARREN TAYLOR,

                              Plaintiff,

                -against-

THE CITY OF NEW YORK; DEPARTMENT OF
CORRECTION COMMISSIONER JOSEPH PONTE;
BUREAU CHIEF OF SECURITY BRIAN SUPRENANT;
CAPTAIN HARPER; DEPUTY WARDEN CORT;
CORRECTION OFFICER ANDERSON #3597;
CORRECTION OFFICER STEVENSON; GRVC
WARDEN YOLANDA CANTY, ASSISTANT DEPUTY
WARDEN SARDIA LEWIS #97; CORRECTION
OFFICER JOHN DOE SUPERVISING AND POLICY
MAKING OFFICIALS, ##1-8; JOHN DOE
CORRECTION OFFICIAL RESPONSIBLE FOR
DETAINEE PLACEMENT IN HOUSING AREAS ##1-4;
JOHN DOE CORRECTION OFFICERS ##1-8,

                           Defendants.

-------------------------------------------------------------------- x

**MEMORANDUM OF LAW
IN OPPOSITION TO
DEFENDANTS' MOTION TO
DISMISS**

16 CV 7857 (NRB)

Stoll, Glickman & Bellina, LLP
By: Leo Glickman
475 Atlantic Ave., 3rd Floor
Brooklyn, NY 11217
(718) 852-3710 (phone)
(718) 852-3586 (fax)
lglickman@stollglickman.com

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES………………………………………………………………………  ii

INTRODUCTION ………..……………………………………………………………………  1

     I.     RESPONSE TO POINT I: THE DOC'S INMATE GRIEVANCE PROGRAM IS NOT AVAILABLE FOR INMATE ON INMATE ASSAULTS …………………………2

     II.    PLAINTIFF MAKES PLAUSIBLE ALLEGATIONS THAT THE CITY HAS A PRACTICE AND/OR CUSTOM TO PLACE DETAINEES IDENTIFIED BY DOC AS RIVAL GANG MEMBERS IN THE SAME HOUSING UNIT AND TO PLACE NON-GANG MEMBERS IN GANG HOUSING UNITS……………………………...  4

     III.   EACH NAMED DEFENDANT WAS PERSONALLY INVOLVED IN THE CONSTITUTIONAL DEPRIVATION SUFFERED BY PLAINTIFF ……………  7

         A.  PONTE AND SUPRETENANT…………………………………………..  8

         B.  CANTY……………………………………………………………………  9

         C.  CORT AND HARPER …………………………………………………… 10

         D.  SARDIA LEWIS ………………………………………………………… 12

         E.  ANDERSON………………………………………………… ……… 14

     IV.   PLAINTIFF HAS PLED PLAUSIBLE CONSTITUTIONAL VIOLATIONS AS TO EACH DEFENDANT UNDER THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT…………………………………………  15

CONCLUSION……………………………………………………………………  21

## TABLE OF AUTHORITIES

**Cases**

**Pages**

Abney v. McGinnis
 380 F.3d 663, 667 (2d Cir. 2004)…………………………………………………………2

Campbell v. Ponte,
2016 WL 3948103 at 3 (S.D.N.Y.  J. Pauley 2016)…………………………………………………...3

Castro v. Cty. of Los Angeles
833 F.3d 1060 (9th Cir. 2016)………………………………………………………………...17

Colon v. Coughlin,
 58 F.3d 865, 873 (2d Cir.1995)…………………………………………………………..8

Darnell v. Pineiro,
849 F.3d 17 at 29 (2d Cir. 2017)……………………………………………………………15,16

Drew v. City of N.Y.
2016 WL 4533660, (S.D.N.Y. M.J. Peck 2016)……………………………………………………..2

Farmer v. Brennan
511 U.S. 825, 833 (1994)……………………………………………………………………10

George v. Cty. of Westchester, NY, at 7 (S.D.N.Y. 2014)……………………………………….. 8

Hurdle v. Bd. of Educ. of City of N.Y.,
113 F. App'x 423, 425 (2d Cir. 2004).  …………………………………………………….. 4

Hutchinson v. Sgt. Pangburn
1998 WL 150959, at 6 (S.D.N.Y. 1998)…………………………………………………… 10

Jeffes v. Barnes
208 F.3d 49, 61 (2d Cir. 2000). ……………………………………………………………4

Los Angeles Cty., Cal. v. Castro
137 S. Ct. 831 (2017)………………………………………………………………………..17

Leybinsky v. Millich,
2004 WL 2202577, at 3 (W.D.N.Y. 2004)…………………………………………………10

Perez v. Ponte
2017 WL 1050109 (SDNY 2017)………………………………………………………………20

Provost v. City of Newburgh
262 F.3d 146, 154 (2d Cir.2001)……………………………………………………...…...8

Randle v. Alexander
960 F.Supp. 2d 457 (S.D.N.Y. 2013)………………………………………………………14

Santos v. N.Y. City,
847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012)…………………………………………………4

Tartt v. City of N.Y.
 2014 WL 3702594 at 4 (S.D.N.Y. J. Caproni 2014)………………………………………3

Taylor v. Swift,
21 F. Supp. 3d 237, 241–43 (E.D.N.Y., J. Weinstein 2014)._……………………………… 8

## TABLE OF AUTHORITIES

<u>**Statutes**</u>                                                                                                            <u>**Pages**</u>

Prison Litigation Reform Act ("PLRA").  42U.S.C.§1997e(a).…………………………………...  2

## INTRODUCTION

The City's bizarrely and unnecessarily hostile motion to dismiss is extremely heavy on insults, hyperbole, and absurdities, and light on argumentation and analysis.  It is literally riddled with phrases like "[T]he court should not indulge this type of self-plagiarism…" and "steaming away Plaintiff's extraneous hot air regarding gang violence at GRVC 15A…" that are simultaneously insulting, hyperbolic, and nonsensical. To the knowledge of the undersigned, "self-plagiarism" is an impossibility and oxymoron, and only water is "steamed away", not air, regardless of temperature.

Plaintiff lost an eye in the incident that is the subject of his complaint.[1]  Though ordered into protective custody, Correction officials placed him in the high security classification, general population of GRVC 15A where numerous gang fights had previously broken out between rival gangs where detainees were badly injured and even killed. Furthermore, just months before Mr. Taylor was attacked by gang members, a Captain charged with investigating the violence wrote in a report that gang violence in that particular house would continue as long as the rival gangs were forced to live in the same housing area.  Nevertheless, DOC officials continued to force these rival gangs to live in the same housing area, which resulted in continued chaos and in the injury to plaintiff.

While plaintiff and the undersigned certainly acknowledge and respect opposing counsel's responsibility to zealously advocate for the City's position, we respectfully suggest that the pervasive over the top and frankly rude language directed at plaintiff and his undersigned counsel is a violation of our State's Standards of Civility for the legal profession, and ought to be

---

[1] Defendants claim that plaintiff was injured by another inmate with a "broomstick."  They use the Use of Force Report to substantiate their claim. Memo of Law p. 3.  Neither the complaint nor the Use of Force Report says any such thing.  This is one of many false claims they make.  On the same page, they say that "plaintiff alleges that as he was in DOC custody for sex crimes, he was entitled to protective custody" citing to Compl. ¶27.  Plaintiff makes no such claim.

1

admonished as such.

## I.     RESPONSE TO POINT I: THE DOC'S INMATE GRIEVANCE PROGRAM IS NOT AVAILABLE FOR INMATE ON INMATE ASSAULTS

b.     Allegations of Assault or Harassment

Inmate allegations of physical or sexual assault or harassment by either staff or inmates are not subject to the IGRP process.  However, IGRP staff shall immediately and appropriately refer such allegations, record reports of such allegations on the IGRP Inmate Report of an Alleged Assault/Harassment (Form 7316R, Attachment D), and enter information from the report into the IGRP database.  IGRP staff shall also complete the IGRP Disposition Form and provide it to the inmate as described in Section IV.B.2, above.

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

The first paragraph is cut and pasted directly from defendants' exhibit "C", which ACC Goykadosh affirms is the DOC Directive that "sets forth the process through which an inmate can file a grievance while in Department of Correction Custody." Goykadosh Decl. ¶3. The second paragraph is from the Prison Litigation Reform Act ("PLRA").  42 U.S.C. § 1997e(a).

It is axiomatic that an incarcerated person can only exhaust remedies that are available. "The PLRA does not require the exhaustion of all administrative remedies, but only those that are 'available' to the inmate." Abney v. McGinnis, 380 F.3d 663, 667 (2d Cir. 2004).  There is simply no procedural mechanism, no administrative remedy, for redress of an inmate who suffers assault or harassment by staff or other inmates.  In reviewing a materially identical provision in the predecessor to Directive 3376 (Def't. Exhibit "C"), district courts have affirmed that assaults on inmates are not grievable.  Taylor v. Swift, 21 F. Supp. 3d 237, 241–43 (E.D.N.Y., J. Weinstein 2014).  See also Drew v. City of N.Y., 2016 WL 4533660, (S.D.N.Y. M.J. Peck

2016); Campbell v. Ponte, 2016 WL 3948103 at 3 (S.D.N.Y.  J. Pauley 2016) ("At Rikers Island, [plaintiff's] complaint ... would be 'not grievable,' and therefore not covered by that [IGRP] process, if it involved allegations of 'assault ....' "; Tartt v. City of N.Y., 2014 WL 3702594 at 4 (S.D.N.Y. J. Caproni 2014) ("[Plaintiff] and Defendants agree that 'Plaintiff's excessive force claim is not subject to the DOC grievance process.')

All of plaintiff's causes of action relate to the assault he suffered on January 10, 2015. Yet, Ms. Goykodosh does not only argue that such causes of action are grievable, but goes so far as to "declare[s] under penalty of perjury", that "[P]lainiff could have filed a grievance regarding any of the issues complained of in the pleadings."  Goykodosh Decl. p.1.  Such is her certainty that she is willing to state it "under penalty of perjury".  The City's Corporation Counsel Office has in the past made an argument that when officers do not assault the plaintiff, but rather another inmate, the failure to protect is grievable.  The court on no uncertain terms rejected such an argument.  Taylor v. Swift, at 243 - 244.  It also went further, stating that even if such an interpretation could be read into the wording (which it declined to do), not grieving would be a "reasonable" if ultimately "mistaken" interpretation which would not bar a plaintiff from the court.  Id. at 244.  The fact that other conditions of his confinement may have been grievable, and plaintiff may or may not have availed himself of the formal procedure (we do not have a record) may or may not be a relevant issue for trial relating to credibility, but it is certainly not a dispositive issue, even if we now had a full record.

Finally, and notably, despite producing numerous documents relating to the complaint, the defendants have not produced the "IGRP Disposition Form" that DOC staff is required to complete and provide to the inmate.  It begs the question whether defendants are demanding plaintiff follow a procedure that is not available to him, while not following procedures that are

3

required of themselves?

We therefore respectfully submit that any claim based on any alleged failure to grieve the claims included in the complaint should be denied.

## II.    PLAINTIFF MAKES PLAUSIBLE ALLEGATIONS THAT THE CITY HAS A PRACTICE AND/OR CUSTOM TO PLACE DETAINEES IDENTIFIED BY DOC AS RIVAL GANG MEMBERS IN THE SAME HOUSING UNIT AND TO PLACE NON-GANG MEMBERS IN GANG HOUSING UNITS

"It is well established that a municipal policymaker may be found to have caused subordinate officials' conduct by reason of the policymaker's "acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity." Hurdle v. Bd. of Educ. of City of N.Y., 113 F. App'x 423, 425 (2d Cir. 2004).  "To establish municipal liability under § 1983… a plaintiff must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists. Additionally, to establish "deliberate indifference" for a failure train or supervise claim, the plaintiff must show (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation;" (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation;" and (3) "that the wrong choice by the ... employee will frequently cause the deprivation of a citizen's constitutional rights." Santos v. N.Y. City, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012).  Thus, "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." (*Internal Supreme Court citations omitted.*)  Jeffes v. Barnes, 208 F.3d 49, 61 (2d Cir. 2000).  It is further "well established in this Circuit that "when examining an individual's status as a policymaker

under <u>Monell</u>, the official in question need not be a municipal policymaker for all purposes. Rather, with respect to the conduct challenged, he must be 'responsible under state law for making policy in that area of the [municipality's] business." <u>Hurdle v. Bd. of Educ. of City of N.Y.</u>, 113 F. App'x 423, 425 (2d Cir. 2004).

Plaintiff pled an extensive history of gang violence in the particular housing unit where plaintiff was housed and injured.  Compl. ¶¶ 14-23.  These are not lawsuits, these are actual documented instances of gang riots caused by rival gang members being housed together, causing serious injuries to gang members and non-gang members.  Also, Plaintiff pled that it was well known to supervisory and policy making staff, including the Warden of the jail, that the riots would continue to occur based on a report submitted by Supervisor Captain Claudel Jean-Pierre. Compl. ¶¶ 24-25.  Jean Pierre's report was submitted to defendant Warden Yolanda Canty.  Furthermore, the investigation and report, referred in the documentation as "COD 646/14" and incorporated by reference in the complaint and attached here as Exhibit "A", was ultimately distributed to the Bureau Chief of Security, defendant Brian Supretenant, the second highest ranked uniformed officer at DOC. [2]

The highest uniformed ranking is the Chief of the Department, which is one person. Below the Chief are Bureau Chiefs.  According to the DOC's web site, there are four Bureau Chiefs each in charge of a particular subject area.  As the Bureau Chief of Security, defendant Brian Supretenant was clearly the person with policymaking discretion for policies and customs regarding the placement of rival gang members in housing areas and the security implications of those customs and policies.

Beyond defendant Supretenant, it is clear that Commissioner Ponte was well aware of the

---

[2] For Jean-Pierre's statements as to the ongoing nature of the gang conflict and the imminence of further violence, see page 182.  For memo distribution to Supretenant, see page 145.

spiraling violence caused by gang fights and riots in DOC facilities.  Stabbings and slashings of inmates have increased from 35 in 2011 to 88 in 2014 and 125 in 2015.  It is known to the DOC that the great majority of those incidents are gang related, i.e. gang members slashing or stabbing rival gang members or non-gang members.[3]   In 2015, Commissioner Ponte stated "[w]e are moving aggressively to stop gang activity through better intelligence, safer housing of inmates, and a concerted push to arrest those involved in crimes in our jails, from changing our visitor rules to prevent contraband smuggling, instituting random cell searches and using super-sensitive, state of the art scanning technology, we will employ all necessary means to keep our officers and inmates safe." Despite his words, little had been done and to date has been done. Indeed, in a report that appeared on television in May, 2017 -- after this complaint was filed – it was reported that the DOC was reforming the way gang members are housed in their facilities one by one but had not completed the task and had no timeline to do so.  Exhibit "B".  In that case, a man was put in a housing unit populated with gang members and was beaten by multiple detainees.  Elias Hasamudeen, a 28 year veteran of the correction force and Correction Officer Union President said that the victim should not have been placed in gang populated housing and that he was "fed to the wolves."

As the complaint pleads, the issue of rival gang and gang member on non-gang member violence is and was well known to the DOC at the highest levels prior to and after this incident. Yet, as the report attached as exhibit B demonstrates, the DOC has not extended reforms that they believe work to reduce gang violence to all facilities even to this late date.   Perhaps it is due to the extraordinary number of days Commissioner Ponte spent at his Maine vacation home last year while converting taxpayer resources for his private gain.  See Exhibit "C".  Regardless,

---

[3] http://www.nydailynews.com/new-york/nyc-crime/gang-members-drive-stabbings-slashings-rikers-island-article-1.2464796

what is clear is that the highest ranking policymakers for security at Rikers Island knew of the spiraling gang violence both inside of housing unit 15A at GRVC specifically and at all DOC facilities generally, they knew, based on their own internal report, that it was very likely to continue, and nevertheless took no or wholly inadequate action to prevent it and in fact, continued to place detainees in that housing unit, such as plaintiff, who were very likely to be injured in that housing unit.

Plaintiff has gone well beyond plausibility in his complaint to demonstrate a municipal liability claim under a theory of custom and practice. "Feeding non gang member and rival gang member inmates to the wolves", to use the parlance of Elias Hasamudeen, was standard operating procedure at GRVC.  It also fits within a theory of a failure to train or supervise. Policymakers such as Bureau Chief Supretenant knew to a moral certainty that his employees would confront the situation of moving detainees into GRVC 15A and place them in grave danger because it had happened so many times before and because he had received a memorandum seven months prior to this incident that the gang riots were likely to continue.  He knew that employees had placed vulnerable detainees in that housing unit because DOC knows there was a need for reform, but were extremely slow to introduce such reforms as noted in Exhibit B.  And finally, he knew that the wrong choice by DOC employees would lead to a deprivation of constitutional rights because it happened many times before in the recent past and, again, the policymaker was explicitly warned about it by memorandum from Captain Jean-Pierre and Warden Canty.

### III.   EACH NAMED DEFENDANT WAS PERSONALLY INVOLVED IN THE CONSTITUTIONAL DEPRIVATION SUFFERED BY PLAINTIFF

To state a Section 1983 claim against the individual defendants, plaintiff must allege their

personal involvement in the claimed violation of his rights. <u>Provost v. City of Newburgh</u>, 262

F.3d 146, 154 (2d Cir.2001). To establish personal involvement, plaintiff must allege defendants

(i) participated directly in the alleged constitutional violation; (ii) were made aware of the

wrongs and failed to remedy them; (iii) created or allowed a policy or custom under which

unconstitutional practices occurred; (iv) were grossly negligent in supervising subordinates who

committed the wrongful acts; or (v) exhibited deliberate indifference to his rights by failing to

act on information indicating unconstitutional acts were occurring. <u>George v. Cty. of</u>

<u>Westchester, NY</u>, at 7 (S.D.N.Y. 2014) *citing* <u>Colon v. Coughlin</u>, 58 F.3d 865, 873 (2d

Cir.1995).

   A.  <u>PONTE AND SUPRETENANT</u>

   These two defendants, as explained above, were personally involved because they created or

allowed a policy or custom under which unconstitutional practices occurred; were at least grossly

negligent in supervising subordinates who committed the wrongful acts; and exhibited deliberate

indifference to plaintiff's rights by failing to act on information indicating unconstitutional acts

were occurring.  We have not only plausibly alleged, but provided proof that Supretenant was

aware by memorandum dated June 11, 2014 that gang riots between rival gangs in GRVC 15A

had occurred on numerous occasions and were likely to continue to occur.  *See* Exhibit A.  In

addition, there were numerous press reports about gang outbreaks of violence at that facility and

housing unit.[4]  As set forth in the complaint and herein, by his own words Commissioner Ponte

publicly articulated his understanding about severe gang violence occurring and promised

reforms (which did not happen or happened so slowly as to demonstrate indifference).  If

---

[4] *See e.g.* http://www.nydailynews.com/news/crime/violent-fight-rikers-island-hour-article-1.1434413;
http://nypost.com/2013/12/15/bronx-crime-stats-spike-over-rikers-gang-war/;
https://www.villagevoice.com/2013/08/14/rikers-fight-club-correction-staff-let-melee-go-for-over-an-hour-without-stopping-it-four-inmates-badly-slashed/;

Commissioner Ponte somehow still did not know about the very specific issue of gang violence in his facilities, he was at the very least grossly negligent and clearly should have known. Plaintiff has at least plausibly pled that defendants Ponte and Supretenant knew of the custom in which unconstitutional practices were occurring and failed to direct subordinates to redress them.

      B.   <u>CANTY</u>

Despite defendants' false remonstrations that plaintiff has misrepresented the contents of the report, a report in their possession and attached herewith, it does in fact warn of continued clashes as long as Crips and Trinitarios are housed together in GRVC 15A. The document, exhibit A page 182, speaks for itself.

Defendant Canty claims that knowledge of a memo written to her by a subordinate employee in connection with a bloody and violent incident which caused 31 inmates to go to the medical clinic, and resulted in serious injuries to many of them, cannot be imputed to her. Deft. Memo of Law p. 16-17. Now that Defendant Canty has been promoted to a Bureau Chief – one of only four second highest ranking uniformed officers – plaintiff hopes that she expects higher standards from her subordinates than she makes of herself in this motion.

Defendants cite to cases in which a letter or complaint to a prison supervisor does not establish personal awareness of the situation in GRVC 15A. That is a correct recitation of the law. Defendant Canty then claims that "the same principle applies to internal reports." Deft. Memo of Law page 16-17. Of course, they cite to no authority for the principle because there are none. The undersigned has conducted a lengthy search for such a proposition to no avail. Presumably, no authority addresses the topic because it is an absurd proposition.

To survive a motion to dismiss, plaintiff must make plausible allegations that, taken as true, support a claim for relief. A memorandum incorporated into the complaint directed to a

supervisor by a subordinate employee in which the supervisor is the only recipient quite clearly makes a plausible case that the supervisory defendant had knowledge – or at least constructive knowledge -- of the conditions described in the memorandum.   Beyond that, it is certainly plausible that a Warden would have knowledge of an existing dangerous condition in a housing unit in which at least six gang fights occurred between the same gangs over a short period of time in one specific housing unit causing numerous serious injuries.  In addition, that these gang riots in this housing unit received press attention and was the subject of a memo from a subordinate warning of more violence to come certainly is enough to impute knowledge or constructive knowledge.  Plaintiff has at the very least plausibly alleged that Warden Canty was grossly negligent or deliberately indifferent to the unconstitutional condition occurring routinely in a housing unit in her jail, and that such deliberate indifference caused injury to plaintiff.

   C.   CORT AND HARPER[5]

      Prison officials, including Defendants Cort, Harper and John Doe Correction Officials Responsible for Detainee Housing Placement, have a duty protect inmates from assault by other inmates under Section 1983.  Farmer v. Brennan  511 U.S. 825, 833 (1994).  A failure to place a detainee in protective custody when he is under threat from other inmates is actionable under Section 1983.  See e.g. Leybinsky v. Millich, 2004 WL 2202577, at 3 (W.D.N.Y. 2004) and Hutchinson v. Sgt. Pangburn, 1998 WL 150959, at 6 (S.D.N.Y. 1998).  Here, plaintiff alleges that because his charges related to an alleged sex crime, that he had been assaulted once and was therefore ordered by the judge to be held in protective custody, that he should not have been moved out of protective custody because it posed a great danger to his safety.  The fact that he was transferred to a housing unit populated by gang members incarcerated at the highest level of

---

[5] Defendants refer to defendant Harper as a "Warden", to our knowledge he was a "Deputy Warden" at the time of this incident.

security risk while he was not a gang member and not a high security risk demonstrates further deliberate indifference on the part of these defendants.

Defendants complain that the plaintiff "fails to state… an understanding of the housing process." Perhaps he should be forgiven, since it is irrelevant to this motion and, as a detainee, not knowable by him.  It is knowable, however, by Ms. Goykadosh.  Yet, she claims under penalty of perjury that "[D]espite being housed in GRVC for a period of approximately eight months, at no point did plaintiff file a grievance or formal request to transfer citing fear for his personal safety or any other reason why he should be transferred."   Goykadosh Decl. ¶5.

Ms. Goykadosh, a lawyer representing the DOC with access to all their procedures, diagrams and institutional knowledge similarly exhibits a lack of understanding of "the housing process", though without an excuse.  Plaintiff was indeed housed in GRVC for 8 months prior to the incident, but the knowledge Ms. Goykadosh is missing here is that there are many housing units within GRVC.  Moreover, some house identified gang members, while others do not.  Some house high security risk detainees, others low security risk, while still others medium risk.  In this case, during his months in GRVC, he was moved from one housing unit to another, landing in the high security gang housing unit 15A much closer in time to the incident occurring.

Furthermore, defendants are in full control of the information that could reveal exactly who was responsible for moving plaintiff from one housing unit within GRVC to the dangerous 15A. Defendants pose the questions "how did defendants Cort and Harper assign plaintiff to GRVC 15A?" and "when did they do so".  The first question is utterly irrelevant to the litigation, and both are utterly unknowable to plaintiff at the pleading stage.  Defendants have those answers. They have produced extraneous documents[6] along with their motion, so why did they not also

---

[6] Bizarrely, they state that to support "a series of untenable allegations, Plaintiff references documents outside the pleadings.  By referencing the documents in the Complaint, they are no longer "outside the pleadings."

11

produce the documents that answer those questions?  If detainees were served fish long after its expiration date causing illness, would they be barred from the court because they could not say in their complaint who decided to serve the bad fish to the detainees and when it was decided?  Of course not.

Plaintiff believes that these two defendants were responsible for his housing in 15A because in his efforts to extricate himself from the unit that is what he was led to believe.  Hence our allegation.  Defendants' reliance on written procedures and directives concerning how inmates are moved *might* be definitive if they were followed by staff 100% of the time.  In fact, we know from NYC Department of Investigations that following procedure does not happen all the time.  Just two months before this incident, DOI published a report in which its uncover investigators were able to sneak in large amounts of weapons, liquor, narcotics and tobacco through the front gate of jails, including GRVC, in part because front gate correction officers did not follow procedures to prevent such smuggling.[7]  If DOC staff fail to follow procedure to help prevent weapons and drugs from getting into the hands of detainees, we respectfully suggest that the court should deny defendants argument that Captain Cort and Deputy Warden Harper could not have been responsible for moving plaintiff to 15A because "the procedures say so."

We therefore that defendants Cort, Harper and John Doe Correction Officials Responsible for Detainee Housing be denied their motion to dismiss.

D. <u>SARDIA LEWIS</u>[8]

Captain Jean-Pierre's offered in his report an honest assessment of the ongoing nature of the gang rioting as of June, 2014 and such activity is likely to continue as long as rival gang

---

[7] http://www1.nyc.gov/assets/doi/downloads/pdf/2014/Nov14/pr26rikers_110614.pdf

[8] Inexplicably, defendants seek to dismiss claims on behalf of Captain Claudel Jean-Pierre.  There is only one aggrieved plaintiff in this case, Warren Taylor.  The court should deny defendants motion to dismiss the "claims" of Captain Jean-Pierre as moot.

members are housed together in 15A.  Plaintiff alleges – and is now confirmed by defendants --
that Assistant Deputy Warden Sardia Lewis took disciplinary action against Captain Claudel
Jean-Pierre in connection with the report he submitted to her.  Compl. ¶25.

Plaintiff further alleges that such action had a chilling effect on reporting of gang
violence in the facility which could have led to reforms that would have prevented plaintiff's
injury.  "ADW Lewis helped create an environment of intimidation and retaliation against
Correction employees who honestly report security problems in the facility.  Such retaliation
creates a culture of cover-up and actual cover-ups in the system, leading to official impunity and
constitutional violations against detainees."  Compl.  ¶57.

In her characteristic way, Ms. Goykadosh states flatly under penalty of perjury that
"Captain Jean-Pierre was disciplined because he failed to properly complete the report."
Goykadosh Decl. ¶6.  She knows this to be a fact apparently because ADW Lewis said so in her
charges against Captain Jean-Pierre.  We had no doubt that ADW Lewis would make this claim
as we had possession of the charges and specifications document produced by defendants.
However, in our experience this is a highly unusual disciplinary action to take under the
circumstances and we believe that it is at the very least plausible that this action was taken to
chill honest reporting about misconduct and unsafe conditions caused by deliberate indifference
by DOC supervisors.

Ms. Goykadosh stating the reason for Captain Jean-Pierre's charges under penalty of
perjury but without personal knowledge is quite irregular, inappropriate and perhaps worse.  Her
admonition to plaintiff that the court should not "take these misrepresentations lightly", and
citing to Rule 11 (Deft. Memo of Law p. 12) makes her practice of asserting "facts" she does not
have personal knowledge about under penalty of perjury all the more perplexing.

13

Covering-up and retaliating against fellow officers for writing a true and accurate report can subject an official to liability. In Randle v. Alexander 960 F.Supp. 2d 457 (S.D.N.Y. 2013), Judge Oetken allowed a case to proceed against a supervising correction official for filing a false report regarding previous conduct which, if true, would have tacitly permitted subordinates to engage in similar behavior. The court found that was sufficient personal involvement for supervisory liability. Id. at 478. Similarly, Plaintiff alleges that Defendant Lewis took a disciplinary action which tacitly permitted other officials, including subordinates, to continue in the unconstitutional conduct by disciplining a writer who reported such conduct.

E.  ANDERSON

Despite characterizing plaintiff's paragraph about his involvement in the incident as "skimpy", defendants offer just 28 words to explain how Anderson is not "personally involved" in the incident. They seem to be suggesting that defendant Anderson had no affirmative duty, as a correction officer, to take steps to safeguard the safety on a detainee being attacked. "Presence alone" they say "must be distinct from involvement." Defendants are clearly mistaken. "We have assumed prison officials have a duty ... to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994).

Anderson seeks to introduce documentation outside the scope of the complaint to demonstrate that he was not personally involved with the incident. Since the "Incident Report Form" states that defendant Anderson instructed other detainees to "stop fighting", his personal involvement cannot be established with respect to Plaintiff.

However, another document that Defendant Anderson is surely familiar with but did not disclose to the court, and is incorporated by reference in the Complaint, is the Report and Notice

14

of Infraction he filed against Defendant Taylor. Compl. ¶41 and Exhibit "D".[9]  He states that

inmates Fooda and Grijalva were in a fight with inmate Taylor.  He then states he gave "verbal

commands to said inmates to stop fighting which were not complied with."  Clearly, this

establishes an interaction between himself and the detainees who assaulted plaintiff.  It also

plausibly alleges an inadequate and deficient response, since other remedial measures beyond

telling Grijalva to "Stop fighting", such as the deployment of OC spray to stop or slow the

violence, could have been undertaken by Anderson.  We allege he did not, that he did not take

any effective actions which may have prevented the injury to plaintiff.  Undoubtedly, as

discovery progresses, there will be more facts in the record to make determinations about what

defendant Anderson could have or could not have done.  Asking this court now to make such a

determination is premature and inappropriate.

       For the foregoing reasons, plaintiff respectfully requests that this court deny defendants'

motion to dismiss for lack of personal involvement.

   IV.     **PLAINTIFF HAS PLED PLAUSIBLE CONSTITUTIONAL VIOLATIONS AS
           TO EACH DEFENDANT UNDER THE DUE PROCESS CLAUSE OF THE
           FOURTEENTH AMENDMENT**

       Prison officials have a duty to protect inmates from assault by other inmates. Farmer v.

Brennan, 511 U.S. 825, 833 (1994).  Plaintiff in the instant case was a pre-trial detainee.  Pre-

trial detainees are entitled to greater protections than incarcerated persons convicted of a crime.

See Darnell v. Pineiro, 849 F.3d 17 at 29 (2d Cir. 2017).   Obviously, detained persons such as

plaintiff in the instant action are presumed innocent, and therefore may not be punished cruelly,

unusually, nor at all.  Id.

       Darnell is the first and only Second Circuit case interpreting the Supreme Court decision

---

[9] It appears that this defendant attempted to mislead the court and plaintiff prior to any discovery taking place by
inappropriately producing certain documents which appear to exonerate him while withholding from the court and
plaintiff implicating documentation.

of Kingsley v. Hendrickson, 135 S. Ct. 2466 (2015).  The Court stated "after Kingsley, it is plain

that punishment has no place in defining the [subjective] *mens rea* element of a pretrial

detainee's claim under the Due Process Clause. Unlike a violation of the Cruel and Unusual

Punishments Clause, an official can violate the Due Process Clause of the Fourteenth

Amendment without meting out any punishment, which means that the Due Process Clause can

be violated when an official does not have subjective awareness that the official's acts (or

omissions) have subjected the pretrial detainee to a substantial risk of harm." [Emphasis added.]

Darnell at 35.

In Darnell, the Second Circuit concluded that "the pretrial detainee must prove that the

defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act

with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even

though the defendant-official knew, or should have known, that the condition posed an excessive

risk to health or safety. Darnell v. Pineiro, 849 F.3d 17, 35 (2d Cir. 2017).  This is a significant

departure from the Eighth Amendment analysis in which a subjective awareness or reckless

disregard of the *punishment* must exist to survive.  Id.

Defendants cite to Darnell, acknowledge that it is law of the Circuit, then proceed to

ignore it.  After their legal exposition on Darnell, they state "No Defendants, including defendant

Anderson, had the necessary state of mind or were on notice that an attack on Plaintiff by another

inmate was imminent."  This is frankly an overly restrictive interpretation of the required

analysis of the Eighth Amendment, and is certainly wrong under the Kingsley / Darnell

Fourteenth Amendment analysis.  As stated above, under Due Process a plaintiff need not show

that the defendants had a subjective awareness that the acts taken have subjected the pretrial

detainee to a substantial risk of harm.  Only that the imposed condition – here, placing plaintiff

in a gang housing unit with a serious and significant recent history of repeated violence, where he is not a gang member, has a lower risk classification, has had his sex related charges published to inmates, and in which at least one of the correction officers on the scene did nothing to prevent the attack on him – posed a risk to his safety.  Clearly, this standard is met for each of the defendants.

Darnell joined and adapted the Ninth Circuit case of Castro v. Cty. of Los Angeles, 833 F.3d 1060 (9th Cir. 2016), cert. denied sub nom. Los Angeles Cty., Cal. v. Castro, 137 S. Ct. 831 (2017).  Castro adapts the Kingsley analysis specifically as to a pre-trial detainee claiming a due process violation he suffered as a result of inmate on inmate violence.  The precise situation plaintiff complains of. The court states "the elements of a pretrial detainee's Fourteenth Amendment failure-to-protect claim against an individual officer are:

> (1)  The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (2)  Those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (3)  The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
>
> (4) By not taking such measures, the defendant caused the plaintiff's injuries."

Castro at 1071.

The court continues "[w]ith respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily "turn[ ] on the 'facts and circumstances of each particular case.' " Kingsley, 135 S.Ct. at 2473 (quoting Graham v. Connor, 490 U.S. 386,

396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)); see also Restatement (Second) of Torts § 500 cmt. a (Am. Law Inst. 2016) (recognizing that "reckless disregard" may be shown by an objective standard under which an individual "is held to the realization of the aggravated risk which a reasonable [person] in his place would have, although he does not himself have it"). Id.

 Applying the facts pled in the Complaint to the analysis in Castro, adapted by this Second Circuit, it is clear the motion to dismiss should be denied as to all defendants.

 Correction Officer Anderson and other John Doe Correction Officers on the scene when the riot broke out failed to take timely corrective action to prevent the fight from escalating. Compl. ¶¶ 38-41.  In fact, one John Doe Correction Officer demanded that plaintiff, who was about 100 feet away from where the riot was occurring, move toward the riot.  Compl. ¶39. Taking the allegations in the complaint as true, each of these defendants would be found liable for plaintiff's injuries.  1) Each made an intentional decision to stand by and not take reasonably effective steps to attempt to stop the rioting, one defendant even taking the intentional decision to command plaintiff to go towards the riot.  2) Not taking such steps put plaintiff at substantial risk of serious harm. 3) These defendants did not take reasonable available measures to abate the risk, such as releasing OC spray, for example, or protecting detainees such as plaintiff who sought to avoid the fighting.  Clearly, any reasonable correction officer would understand the risk to plaintiff and other detainees involved with such decisions.  4) Finally, not abating the rioting going on and commanding that plaintiff move towards the fight caused plaintiff's injuries.

 The Complaint alleges that Defendant ADW Lewis 1) made an intentional decision to discipline Captain Jean-Pierre in connection with the submission of his report on the seriousness of gang violence in GRVC 15A and its likelihood of continuing.  In doing so, ADW Lewis created an environment in which truthfully reporting about the DOC created dangerous

conditions in 15A would lead to punishment and adverse consequences for the career of correction officers.  2) Punishing Captain Jean-Pierre for his truthful report about 15A helped to continue the dangerous environment at 15A, putting plaintiff who was placed there at substantial risk of serious harm.  3) ADW Lewis took no other known official action with respect to the report.  It is a fact that when Captain Jean-Pierre's report was submitted on June 11, 2014, Crips and Trinitarios were being housed together, that being housed together was causing fights and riots to break out that were causing injuries to detainees, and finally, that it would continue into the future as long as they continued to be housed together.  We further know and it is pled that on January 10, 2015, Crips and Trinitarios were still being housed together in 15A and that a riot broke out between them causing injury to plaintiff.  Clearly, the consequences of the alleged retaliation for Capt. Jean-Pierre's report by ADW Lewis were obvious, that gang violence would continue inside GRVC 15A, because other correction officials would be chilled from reporting truthfully about it.  *See* Compl. ¶¶ 24, 25, 56, 57.  The action caused plaintiff to suffer the injury.

Plaintiff alleges that <u>Defendants Cort, Harper and John Doe Correction Officials Responsible for Detainee Housing Placement</u> made the decision and facilitated his move to general population at GRVC 15A.  1) and 2) It was clearly an intentional decision to move him to that facility, and, as described above, being there put him at substantial risk.  As the Complaint alleges, Plaintiff had been assaulted by inmates at a DOC facility some months prior to the incident and he was ordered by Justice Chun into protective custody because he and plaintiff and his lawyer believed that his charges put him in particular danger of attack.[10]  Nevertheless, Cort, Harper and <u>John Doe Correction Officials Responsible for Detainee Housing</u> ignored the order and his court card and nevertheless placed him in an extremely dangerous general population

---

[10] Defendants refer to this cause of his need for protective custody as a "hedge".  Defendants apparently do not, but should, understand that there may be more than one reason that a particular detainee faces risk.  They each come into play in this case and only amplify the deliberate indifference displayed by defendants.

housing unit.  Compl. ¶¶31-36.  3) These defendants had reasonable measures available to them to avoid the risk, such as leaving him in his housing facility and in protective custody or moving him to a less dangerous housing area and keeping him in protective custody.  As the complaint demonstrates and alleges, DOC is operating well below its capacity (about 60%) and has available space for detainees.  Compl. ¶53-54.  Yet, these defendants chose not to take reasonable available measures to avert the risk, 4) causing plaintiff to suffer injury.  Id.

## B.   PLAINTIFF CLAIMS THAT DEFENDANTS FAILED TO PROTECT HIM WITH DELIBERATE INDIFFERENCE TO HIS SAFETY, NOT FOR BEING TRANSFERRED FROM ONE HOUSING UNIT TO ANOTHER

Plaintiff here has pled a failure to protect case against defendants for obviously putting him in a situation that put him at grave and high risk of being injured, and father, that he was predictably injured.  He was permanently damaged by the loss of an eye. Defendants rely on Perez v. Ponte 2017 WL 1050109 (SDNY 2017) for the holding that the "mere transfer of a pre-trial detainee with a prison population… does not give rise to a protected liberty interest."  Deft. Memo of Law at 21.  That is correct.  But it is also true that that is not at all what plaintiff pleads here, the "mere" transfer. Rather, it is the transfer into a housing unit in which defendants knew or clearly should have known placed him in particular danger.  In Perez, the plaintiff was indeed complaining about being transferred to a certain housing unit that he believed was more restrictive of his liberty.  That is not the case here and the case is wholly inapposite.

Defendants also attach Exhibit H to their memo of law.  They argue that court orders to place a person in Protective Custody is merely a "recommendation".  It is not only a recommendation.  As their own document indicates, the court order triggers an automatic placement into temporary protective custody.  Thereafter, the Operations Security Intelligence Unit conducts an investigation and determines whether the detainee should remain in protective

custody.  Its final determination must be documented on form 6007B. See deft. Ex. H at IV.C.4.

Tellingly, defendants have not produced the determination form, despite producing other documents they deem helpful to their case.

The existence of the protective custody procedure directive does not vitiate defendants' duty to protect detainees from assaults by other inmates.  Defendants can still disregard obvious dangers with deliberate indifference in their determinations even if they follow procedure.  But it is noteworthy that defendants discuss the existence of the procedure but do not aver that they followed the procedure.

<u>**CONCLUSION**</u>

For all the foregoing reasons, defendants' motion to dismiss should be denied.

DATED:        Brooklyn, NY
              June 12, 2017

                                   STOLL, GLICKMAN & BELLINA, LLP


                         BY: _____ _____
                                   Leo Glickman
                                   Attorney for Plaintiff
                                   475 Atlantic Ave. 3rd flr.
                                   Brooklyn, NY 11217
                                   (718)852-3710
                                   lglickman@stollglickman.com

21